IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **LORI DICKSON** | § | |
| | § | |
| v. | § | CASE NO. 6:17-cv-103 |
| | § | |
| **ETHICON, INC., and** | § | |
| **JOHNSON & JOHNSON** | § | JURY TRIAL REQUESTED |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

COMES NOW, Plaintiff Lori Dickson, and files the above-styled cause of action complaining of Defendants Ethicon, Inc. and Johnson & Johnson, and would respectfully show the Court as follows:

### I. PARTIES

1. Plaintiff, Lori Dickson, is an individual citizen residing in Waco, McLennan County, Texas.

2. Defendant Ethicon, Inc. ("Ethicon") is a wholly owned subsidiary of Defendant Johnson & Johnson with its corporate headquarters in Somerville, New Jersey. Defendant Ethicon is a foreign corporation licensed to do business in the State of Texas and may be served by serving its registered agent, C T Corporation System, at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

3. Defendant Johnson & Johnson ("J&J") is a New Jersey corporation that has its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey. Defendant Johnson & Johnson does business in the State of Texas but does not maintain a registered agent for service of process in this state. Therefore, Johnson & Johnson may be served with process by serving the Texas Secretary of State as substituted agent for

service of process under Tex. Civ. Prac. & Rem. Code §§ 17.044(a) and (b) at the following address: Office of the Secretary of State, Statutory Documents Section-Citations Unit, 1019 Brazos Street, Austin, Texas 78701.

## II. JURISDICTION & VENUE

4. Plaintiff, Lori Dickson, is a resident of the Western District of Texas. Defendant Johnson & Johnson and its wholly owned subsidiary, Defendant Ethicon, Inc., are foreign corporations with their principal places of business in a state other than the State of Texas.

5. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The amount in controversy as to each Defendant exceeds the sum of $75,000, exclusive of costs and interest, and the action is between citizens of different states.

6. Venue in this District is proper under 28 U.S.C. § 1391. The events and omissions giving rise to Plaintiff's causes of action occurred in substantial part in this District, where the Defendants transact business.

## III. FACTUAL BACKGROUND

*Lori Dickson*

7. On September 27, 2012, Dr. Webster Lowder of Providence Health Center implanted an Ethicon Physiomesh Flexible Composite Mesh Device ("Physiomesh") (Mfg. No. PHY1015V; Lot No. ED8GGHAD) laparoscopically into Lori Dickson to treat her incisional hernia. The surgery took place at Providence Health Center in Waco, Texas.

8. Plaintiff's condition was not remedied by the laparoscopic procedure. Rather, the hernia, which had purportedly been corrected, returned within days of the surgery.

9. On October 10, 2012, Plaintiff was admitted again to Providence Health Center in order to repair a recurrent incisional hernia. The surgeon performing the procedure, Dr. Webster

Lowder, noted that he, "could easily visualize the superior aspect of the mesh that had been placed laparoscopically and the tail that had been intended to hang down well over the symphysis pubis as one would use a long shirttail pulled up into the wound. I trimmed this off and then actually secured this to the undersurface of the abdominal wall with interrupted PDS sutures." Dr. Webster then, via an open repair surgery, implanted another Physiomesh (Mfg. No. PHY1015V; Lot No. EC8KMTA1) into Plaintiff.

10. On or about July 4, 2013, Plaintiff experienced a rush of extreme pain. Her bowels had come loose through her muscular wall, causing Plaintiff to appear pregnant. Plaintiff was rushed into surgery. Doctor Karen Ni-Jones at Hillcrest Hospital performed the surgery. After the surgery, Dr. Ni-Jones explained that the Physiomesh implanted by Dr. Webster had disintegrated into Plaintiff's bowels and intestines and that Plaintiff's bowels had begun to wrap around the mesh. Dr. Ni-Jones explained that she was not able remove the entirety of the Physiomesh.

11. Plaintiff now continuously suffers from ongoing hernia complications. She suffers from hematuria and chronic interstitial cystitis. She will never be able to lift more than 10 to 12 pounds without extreme pain and inflammation. Plaintiff was forced to give up her 22-year career as a respiratory therapist because of the injuries caused by the Physiomesh. Moreover, Plaintiff's physicians tell her that her condition is not correctable, and that, "this is your life now." Not until just recently, when Defendants issued a recall of their Physiomesh product line, did Plaintiff realize or understand that the Physiomesh product was defective and was the cause behind her injuries.

*History of Physiomesh*

12. Defendants J&J and Ethicon were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution and sale of Physiomesh, including providing the warnings and instructions concerning the hernia mesh product.

13. Among the intended purposes for which Defendants J&J and Ethicon designed, manufactured and sold Physiomesh was use by surgeons for hernia repair surgeries. That was the purpose for which the Physiomesh was implanted in Plaintiff. Indeed, Defendants represented to Plaintiff and her physicians that their Physiomesh was a safe and effective product for hernia repair.

14. Defendants' Physiomesh was defectively designed and/or manufactured, was not reasonably safe for its intended use in hernia repair, and the risks of the design outweighed any potential benefits associated with the design. As a result of the defective design and/or manufacture of the Physiomesh, there was an unreasonable risk of severe adverse reactions to the mesh or mesh components, including: chronic pain; recurrence of hernia; foreign body response; rejection; infection; inadequate or failure of incorporation/ingrowth; migration; scarification; deformation of mesh; improper wound healing; excessive and chronic inflammation; adhesions to internal organs; erosion; abscess; fistula formation; granulomatous response; seroma formation; nerve damage; tissue damage and/or death; and other complications.

15. There is compelling clinical and scientific evidence probative of the assertion that Physiomesh is biologically incompatible with human tissue[1], and the risks of the Physiomesh

---

[1] *See* Pawlak, Maciej., et al., *Comparison of two different concepts of mesh and fixation technique in laparoscopic ventral hernia repair: a randomized controlled trial*, Surg. Endosc. (2016) 30:1188-1197 (Attached hereto as "Exhibit A").

design outweigh any potential benefit.[2] This biological incompatibility exists because, inter alia, Defendants' design and manufacture of the mesh utilizes polypropylene material. Defendants designed Physiomesh with monofilament polypropylene mesh coated with a monocryl (polyglecaprone 25) absorbable barrier layers, one to each side of the polypropylene mesh. An undyed polydioxanone film provides the bond between the polyglecaprone-25 film and polypropylene mesh. Physiomesh is thus comprised of inelastic properties, and clinical and scientific data suggests the inelasticity creates the biological incompatibility with human tissue.

16. Defendants designed, manufactured, packaged, labeled, marketed, sold, and distributed Physiomesh despite its biological incompatibility with human tissue. In fact, Defendants withdrew the product from the global market in response to the dissemination of unpublished data from two (2) large independent hernia registries in Europe.[3] This data, furthermore, concludes that hernia recurrence and reoperation rates after LVIHR in patients implanted with Physiomesh or other similar polypropylene mesh are substantially higher than the average rates of comparator sets of meshes. The reoperation and recurrence rates are higher because, among other things, Physiomesh substantially consists of inelastic properties biologically incompatible with human tissue. Both clinical and scientific studies have found that the inelastic mesh may break down in its structure and allow the hernia to recur. Summarily, patients implanted with Physiomesh are at a substantially greater risk of needing further surgery due to the product's complications concerning design, manufacture, safety, and efficacy. The foregoing complications include but are not limited to chronic pain, infection, greater risk for hernia recurrence and reoperation, adhesion, intestinal blockage, bowel obstruction, mesh

---

[2] *See* Baumann, Donald, et al, *Bioprosthetic Mesh in Abdominal Wall Reconstruction*, Semin. Plast. Surg. 2012, 26:18-24. (Attached hereto as "Exhibit B").
[3] *See* Urgent Field Safety Notice Ethicon Physiomesh™ Flexible Composite Mesh (May 25, 2016) (Attached hereto as "Exhibit C").

migration, mesh contraction, bleeding, perforation, inadequate or failure of incorporation/ingrowth, scarification, deformation of mesh, improper wound healing, chronic inflammation, erosion, abscess, fistula formation, granulomatous response, seroma formation, nerve damage, and tissue damage.

17. Defendants learned of the product's high failure rate through, inter alia, the serious adverse events reported to the Food and Drug Administration (FDA). These adverse events were experienced by patients who were implanted with the product shortly after Physiomesh was cleared under the 510(k) fast-tracked approval process. Due to clear patient safety issues presented by the adverse events and thereby imputed to Defendants, Defendants knew or should have known Physiomesh was defectively designed and/or manufactured, was not reasonably safe for its intended use in hernia repair, and the risks of the design outweighed any potential benefits flowing therefrom. Nonetheless, Defendants continued to manufacture, package, label, market, sell, distribute, and place into the stream of commerce Physiomesh Flexible Composite Mesh.

18. The FDA's fast-tracked 510(k) clearance process does not require clinical trials for safety and efficacy. Defendants received 510(k) clearance in April 2010. Within the same year of approval, Defendants became aware through adverse event reports that the product presents significant complications concerning design, safety, manufacture, and efficacy. Despite receiving the foregoing adverse event reports, Defendants decided to keep the product within the global market and did not remove Physiomesh from the market until the dissemination of unfavorable clinical data from two European hernia registries, supra.

19. Defendants were aware of the product's complications concerning design, manufacture, safety, and efficacy after Defendants placed the product into the stream of

commerce and before Plaintiff suffered the injuries stated herein, infra. But Defendants nonetheless failed to warn both surgeons and consumers about the product's complications concerning safety and efficacy, including but not limited to the following: chronic pain, infection, greater risk for hernia recurrence and reoperation, adhesion, intestinal blockage, bowel obstruction, mesh migration, mesh contraction, bleeding, perforation, inadequate or failure of incorporation/ingrowth, scarification, deformation of mesh, improper wound healing, chronic inflammation, erosion, abscess, fistula formation, granulomatous response, seroma formation, nerve damage, and tissue damage.

20.  The Physiomesh's multi-layer coating was represented and promoted by J&J and Ethicon to prevent or minimize adhesion and inflammation, and to facilitate incorporation of the mesh into the body. But the multi-layer coating did not do so. Instead, it prevented adequate incorporation of the mesh into the body and caused or contributed to an intense inflammatory and chronic foreign body response, resulting in an adverse tissue reaction that included migration and damage to surrounding tissue in the form of sclerotic, granulomatous and/or fibrotic tissue, and improper healing.

21.  The multi-layer coating of the J&J and Ethicon Physiomesh is cytotoxic, immunogenic, and not biocompatible. The coating therefore causes or contributes to complications such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications. Defendants knew or should have known of the cytotoxic and immunogenic properties of the multi-layer coating of the Physiomesh prior to introducing it into the stream of commerce.

22.  The polypropylene mesh portion of the Physiomesh was insufficient to withstand normal abdominal forces, resulting in recurrent hernia formation and/or rupture and deformation

of the mesh itself. When the multi-layer coating of the Physiomesh is disrupted and/or degrades, the "naked" polypropylene mesh is exposed to the adjoining tissue and viscera, and can become adhered to organs, causing damage to organs, and potential fistula formation.

23. These manufacturing and design defects associated with the Physiomesh were directly and proximately related to the injuries suffered by Plaintiff.

24. Neither Plaintiff nor her implanting physician was adequately warned or informed by J&J or Ethicon of the defective and dangerous nature of Physiomesh. Moreover, neither Plaintiff nor her implanting physician was adequately warned or informed by J&J or Ethicon of the risks associated with the Physiomesh or the frequency, severity, or duration of such risks.

25. The Physiomesh implanted in Plaintiff failed to reasonably perform as intended. The mesh caused serious injury and had to be surgically removed via invasive surgery, and necessitated additional invasive surgery to repair the incisional hernia that the Physiomesh was initially implanted to treat.

26. Plaintiff's severe adverse reaction, and the necessity for surgical removal of the Physiomesh, directly and proximately resulted from the defective and dangerous condition of the product and defective and inadequate warnings by Defendants J&J and Ethicon about the risks associated with the product, and the frequency, severity and duration of such risks. Plaintiff has suffered, and will continue to suffer, both physical injury and pain and mental anguish, permanent scarring and disfigurement, lost wages and earning capacity, and has incurred substantial medical bills and other expenses, resulting from the defective and dangerous condition of the product and from Defendants' defective and inadequate warnings about the risks associated with the product.

27. But for the existence of Physiomesh within the global market and Defendants' failure to warn both surgeons and consumers—including both Plaintiff and her physicians—of the medically significant complications surrounding Physiomesh, Plaintiff and her physicians would not have elected to utilize Defendants' product.

28. The product at issue here has numerous defects creating unreasonable risks of dangerous injuries, side effects, and severe, permanent adverse health consequences to ordinary persons. These defects include but are not limited to the following:

   a. the material used is not inert and thus promotes a negative reaction to human tissue and/or other natural human bodily contents;

   b. the product and mesh components migrate from the location of implantation;

   c. the product and mesh components abrade human tissue;

   d. the product and mesh components regularly fail to perform their intended medical purpose, and are associated with an elevated risk of removal and recurrent reparative treatment and/or surgery;

   e. the product's defects cause significant complications requiring removal and recurrent reparative treatment and/or surgery;

   f. subsequent to implantation, the product and mesh components become embedded in human tissue, the abdominal wall, and organs, such that when the product's complications require removal, the removal then causes significant and potentially irreparable damage to organs and tissues; and

   g. the product is defective in shape, composition, weight, physical properties, chemical properties, mechanical properties, and improperly designed and engineered for its ostensible clinical indications.

29. Because of the product's numerous defects, Physiomesh creates an unreasonable risk of injury and adverse health consequences to ordinary patients, including but not limited to the following: chronic pain, infection, greater risk for hernia recurrence and reoperation, adhesion, intestinal blockage, bowel obstruction, mesh migration, mesh contraction, bleeding, perforation, inadequate or failure of incorporation/ingrowth, scarification, deformation of mesh,

improper wound healing, chronic inflammation, erosion, abscess, fistula formation, granulomatous response, seroma formation, nerve damage, and tissue damage.

30. Before Plaintiff was implanted with the product, Defendants gained actual knowledge of its aforesaid numerous defects, including but not limited to those stated herein.

31. Defendants designed, manufactured, packaged, labeled, marketed, sold, distributed, and placed into the stream of commerce Physiomesh, with the intent for it to be implanted in patients such as Plaintiff who were clinically indicated for the product's ostensible benefits.

32. Defendants were aware that implanting the product in clinically indicated patients carried a substantial likelihood of injury and harm. In the alternative, Defendants failed to exercise reasonable care in determining the risks and potential adverse consequences of the widespread implantation of Physiomesh in patients worldwide.

33. Defendants made public representations in the form of written product descriptions, product labels, package inserts, and promotional materials that contended implantation of the product in clinically indicated patients was safe and would not cause harm.

34. Defendants affirmatively misrepresented facts concerning the product's benefits, potential complications/adverse health consequences, and contraindications, with the intent that the misrepresentations be relied upon by members of the public.

35. When Defendants and/or their agents, employees, or servants made these misrepresentations, they knew the same was false, inaccurate, or misleading. In the alternative, Defendants and/or their agents, employees, or servants knew or should have known the statements are misrepresentations of material fact or are otherwise false, inaccurate, or misleading.

36. Defendants knowingly made material misrepresentations to the FDA both before, during and after the 510(k) approval process concerning the design, manufacture, safety, and efficacy of the product.

37. Defendants held actual knowledge of the product's defects and adverse health implications before both Plaintiff and other patients worldwide were respectively implanted with the product. Nonetheless, Defendants did not remove the product from the global market.

38. Defendants failed to provide adequate warnings concerning the products complications and adverse health implications, including but not limited to an unreasonable risk of failure to perform its intended purpose and concomitant adverse health consequences stated herein, such as recurrent corrective surgery to repair the hernia and/or other consequences of the mesh.

39. In May of 2016, J&J and Ethicon issued a notice entitled "Urgent: Field Safety Notice," relating to its Physiomesh Flexible Composite Mesh—the same product implanted in Plaintiff. They sent such notification to hospitals and medical providers in various countries worldwide. In their safety notice, Defendants advised the providers of "a voluntary product recall" of Physiomesh Flexible Composite Mesh. The recall cited two international device registries reporting data reflecting recurrence/reoperation rates after laparoscopic placement as higher than that observed from a data set relating to patient outcomes after implantation with other mesh.

## IV. CAUSES OF ACTION

*Negligence*

40. Plaintiff realleges all previous paragraphs as if fully restated herein, verbatim.

41. Although Defendants J&J and Ethicon had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, training, and preparing written instructions and warnings for Physiomesh, they failed to do so.

42. Defendants knew, or in the exercise of reasonable care should have known, that the Physiomesh Flexible Composite Mesh Device was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients like Plaintiff in whom Physiomesh was implanted. They also knew or should have known that Plaintiff and her physicians were unaware of the dangers and defects inherent in the Physiomesh.

43. As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, training and preparing written instructions and warnings for Physiomesh, Plaintiff suffered injuries and damages as summarized in this Original Complaint.

*Strict Liability: Design Defect*

44. Plaintiff realleges all previous paragraphs as if fully restated herein, verbatim.

45. At the time the Physiomesh was implanted in Plaintiff, the mesh product was defectively designed. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended. Further, Defendants J&J and Ethicon failed to design against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

46. Defendants expected and intended the Physiomesh product to reach users such as Plaintiff in the condition in which the product was sold.

47. The implantation of Physiomesh in Plaintiff was medically reasonable, and was a type of use that Defendants J&J and Ethicon intended and foresaw when they designed, manufactured and sold the product.

48. The risks of the Physiomesh design significantly outweigh any benefits that Defendants contend could be associated with the design. The multi-layer coating, which is not used in any other hernia mesh product sold in the United States, prevents tissue from incorporating into the mesh, leading to encapsulation, deformation, scarification and contraction, migration, erosion and rejection. Additionally, the impermeable multi-layer coating of the Physiomesh leads to seroma formation, provides a breeding ground for infection, and protects bacteria from being eliminated by the body's natural immune response.

49. The multi-layer coating of the Physiomesh, which was marketed, promoted and intended as a barrier against adhesion to the internal organs, was only temporary; it was expected and intended to degrade over time inside the body. Thus, the coating prevented tissue in-growth in the short term, and degraded in the long-term, eventually leaving the "naked" polypropylene mesh exposed to the internal viscera and tissues. The degradation of the multi-layer coating caused or exacerbated an intense inflammatory and foreign body reaction. Once exposed to the viscera, the polypropylene mesh will inevitably adhere to the viscera, initiating a cascade of adverse consequences. Any purported beneficial purpose of the multi-layer coating (to prevent adhesion to the internal viscera and organs) was non-existent. The product provided no benefit, while substantially increasing the risks to the patient.

50. The polypropylene mesh within the defective multi-layer coating of the Physiomesh was itself dangerous and defective, particularly when used in the manner intended by Defendants in the Physiomesh. When implanted adjacent to the intestines and other internal

organs—as Defendants intended for Physiomesh—polypropylene mesh is unreasonably susceptible to adhesion, bowel perforation or erosion, fistula formation and bowel strangulation or hernia incarceration, and other injuries.

51. The polypropylene mesh used in the Physiomesh device was insufficient in strength to withstand the internal forces of the abdomen after implantation, which made the device susceptible to rupture and/or deformation. That occurred with the Physiomesh implanted in Plaintiff.

52. The appropriate treatment for complications associated with Physiomesh involves additional invasive surgery to remove the mesh from the body, thus eliminating any purported benefit that the mesh was intended to provide to the patient. Plaintiff underwent additional invasive surgery.

53. Physiomesh was designed and intended for incisional implantation, which involved the product being implanted in contact with the intestines and/or other internal organs. The contact unnecessarily increased the risks of adhesion, erosion, fistula formation, and other injuries.

54. At the time the Physiomesh was implanted in Plaintiff, the warnings and instructions provided by J&J and Ethicon for the Physiomesh were inadequate and defective. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design and/or manufacture against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

55. At the time the Physiomesh was implanted in Plaintiff, there were safer feasible alternative designs for hernia mesh products that would have prevented the injuries she suffered.

56. The Physiomesh product costs significantly more than competitive products because of its unique multi-layer coating, even though the multi-layer coating provided no benefit to consumers, and increased the risks to patients implanted with these devices.

57. The Physiomesh implanted in Plaintiff failed to reasonably perform as intended and had to be surgically removed, necessitating further invasive surgery to repair the very issue that the product was intended to repair. Thus, it provided no benefit to her.

58. As a direct and proximate result of the defective and unreasonably dangerous condition of the product, Plaintiff suffered injuries and damages as summarized in this Original Complaint.

*Strict Liability: Failure to Warn*

59. Plaintiff realleges all previous paragraphs.

60. At the time the Physiomesh was implanted in Plaintiff, the warnings and instructions Defendants J&J and Ethicon provided for the Physiomesh were inadequate and defective. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended. Defendants failed to design and/or manufacture against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

61. Defendants expected and intended the Physiomesh product to reach users such as Plaintiff in the condition in which the product was sold.

62. Plaintiff and her physicians were unaware of the defects and dangers of Physiomesh, and were unaware of the frequency, severity, and duration of the defects and risks associated with the Physiomesh.

63. Defendants' Instructions for Use (IFU) provided with the Physiomesh expressly understated and misstated the risks known to be associated specifically with the Physiomesh. The IFUs stated that "Potential adverse reactions are those typically associated with surgically implantable materials." But no other surgical mesh sold in the U.S.—and no other "surgically implantable material"—suffers the same serious design flaws as Physiomesh. And no other device or material contains the dangerous and defective multi-layer coating, which itself causes or increases the risks of numerous complications. Those complications include prevention of mesh incorporation, increased risk of seroma formation, immunologic response, increased risk for infection, and increased inflammatory reaction and foreign body response. Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique design of the Physiomesh.

64. The Physiomesh IFU failed to adequately warn Plaintiff's physicians of numerous risks which J&J and Ethicon knew or should have known were associated with the product. They include the risk of the Physiomesh's inhibition of tissue incorporation, pain, immunologic response, dehiscence, encapsulation, rejection, migration, scarification, shrinkage/contraction, adhesion to internal organs and viscera, erosion through adjacent tissue and viscera, intestinal obstruction, failure of repair/hernia recurrence, hernia incarceration or strangulation, or rupture of the mesh.

65. J&J and Ethicon failed to adequately warn Plaintiff or her physicians about the necessity for invasive surgical intervention in the event of complications. Defendants also failed to train the physicians on how to properly treat such complications when they occurred.

66. Defendants failed to adequately warn Plaintiff or her physicians that the necessary surgical removal of the Physiomesh in the event of complications would leave the hernia

unrepaired, and would necessitate further medical treatment to attempt to repair the same hernia that the failed Physiomesh was intended to treat.

67. J&J and Ethicon represented to physicians, including Plaintiff's physicians, that the multi-layer coating would prevent or reduce adhesion. They expressly intended for the Physiomesh to be implanted in contact with the intestines and internal organs and marketed and promoted the product for that purpose. But Defendants failed to warn them that the multi-layer coating prevented tissue ingrowth, which is the desired biologic response to an implantable mesh device. They further failed to warn physicians that the multi-layer coating was only temporary and therefore at best would provide only a temporary adhesion barrier. Thus, when the coating inevitably degraded, the exposed polypropylene would become adhered to the organs or tissue.

68. With respect to the complications listed in their warnings, J&J and Ethicon provided no information or warning regarding the frequency, severity and duration of those complications, although the complications associated with Physiomesh were more frequent and severe, and lasted longer than those with safer feasible alternative hernia repair treatments.

69. If Plaintiff or her physicians had been properly warned of the defects and dangers of Physiomesh, and of the frequency, severity and duration of the risks associated with the Physiomesh, she would not have consented to allow the Physiomesh to be implanted in her body, and her physicians would not have implanted the Physiomesh in Plaintiff.

70. As a direct and proximate result of the inadequate and defective warnings and instructions, Plaintiff suffered injuries and damages as summarized in this Original Complaint.

*Strict Liability: Manufacturing Defect*

71. Plaintiff realleges all previous paragraphs.

72. The Physiomesh contained a manufacturing defect when it left the possession of J&J and Ethicon. The Physiomesh differs from their intended result and/or from other ostensibly identical units of the same product line.

73. The manufacturing defects in the Physiomesh were a producing cause of Plaintiff's injuries and damages specified in this Original Complaint.

*Breach of Implied Warranty*

74. Plaintiff realleges all previous paragraphs.

75. At the time Defendants J&J and Ethicon designed, manufactured, produced, tested, studied, inspected, labeled, marketed, advertised, sold, promoted and distributed the Physiomesh for use by Plaintiff, they knew of the intended use of the Physiomesh, and impliedly warranted their product to be of merchantable quality, and safe and fit for its intended use.

76. When the Physiomesh was implanted in Plaintiff to treat her hernias, the Physiomesh was being used for the ordinary purposes for which it was intended.

77. Plaintiff, individually and/or by and through her physicians, relied upon Defendants' implied warranties of merchantability in consenting to have the Physiomesh implanted in her.

78. Contrary to such implied warranties, the Physiomesh was not of merchantable quality, and was not safe and/or was not fit for its intended use. The Physiomesh was unreasonably dangerous and unfit for the ordinary purposes for which it was used. Defendants J&J and Ethicon failed to warn of known or reasonably scientifically knowable defects in the Physiomesh.

79. As a direct and proximate result of the conduct of Defendants J&J and Ethicon, Plaintiff suffered the injuries and damages described in this Original Complaint.

## V. PUNTIVE DAMAGES

80. Plaintiff realleges all previous paragraphs.

81. Defendants J&J and Ethicon failed to adequately test and study the Physiomesh to determine and ensure that the product was safe and effective before releasing it for sale for permanent human implantation; and they continued to manufacture and sell Physiomesh after obtaining knowledge and information that the product was defective and unreasonably unsafe.

82. Even though Defendants have other hernia repair mesh devices that do not present the same risks as the Physiomesh Flexible Composite Mesh Device, they developed, designed and sold Physiomesh, and continued to do so, because the Physiomesh has a significantly higher profit margin than other hernia repair products. Defendants J&J and Ethicon were aware of the probable consequences of implantation of the dangerous and defective Physiomesh, including the risk of failure and serious injury, such as suffered by Plaintiff. They willfully and recklessly failed to avoid those consequences, and in doing so, acted intentionally, maliciously and recklessly with regard to the safety of those persons who might foreseeably have been harmed by the Physiomesh product, including Plaintiff, justifying the imposition of punitive damages.

## VI. JURY DEMAND

83. Plaintiff demands a jury trial.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lori Dickson seeks judgment against Defendants Johnson & Johnson and Ethicon, Inc., jointly and severally, as follows:

1. Economic and non-economic damages for Plaintiff's:

   a. Medical expenses, past and future;

   b. Physical impairment, past and future;

    c. Loss of enjoyment of life, past and future;

    d. Lost wages, past and future;

    e. Lost wage earning capacity, past and future;

    f. Physical pain and mental anguish, past and future; and

2. Punitive damages in the maximum amount permitted by law;

3. An award of attorneys' fees and costs of suit, as allowed by law; and

4. Such other legal and equitable relief as this Court deems just and proper.

    Respectfully Submitted,

**HALEY & OLSON**
A PROFESSIONAL CORPORATION

100 Ritchie Road, Suite 200
Waco, Texas   76712
Telephone:  (254) 776-3336
Facsimile:   (254) 776-6823

BY:  /s/ Craig D. Cherry
**CRAIG D. CHERRY**
State Bar No. 24012419
Email:  ccherry@haleyolson.com
**BENJAMIN D. EVANS**
State Bar No. 24081285
Email: bevans@haleyolson.com

**ATTORNEYS FOR PLAINTIFF**